Filed 2/27/23  In re T.Y. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re T.Y., Jr., et al. Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.D.,<br><br>        Defendant and Appellant. | A164644<br><br>(Contra Costa County<br> Super. Ct. Nos. J21-00283 &<br>J21-00284) |

In these dependency proceedings, L.D. (mother) appeals from jurisdictional findings and dispositional orders concluding that her children T.Y., Jr. (T.Y.) and Y.Y. were described by Welfare and Institutions Code[1] section 300, subdivision (b), adjudging them juvenile court dependents, and placing them in foster care.  Mother asserts on appeal that there was insufficient evidence to support the jurisdictional findings related to her conduct.  She also claims the juvenile court's dispositional removal order was not adequately supported by the evidence.  And she argues that there was

---

[1] All section references are to the Welfare and Institutions Code unless otherwise specified.

insufficient inquiry in this case as to the children's possible Indian status under the Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 et seq. (ICWA). We affirm.

## I.  BACKGROUND

In June 2021, the Contra Costa County Children and Family Services Bureau (Bureau) filed dependency petitions with respect to T.Y. (born July 2013) and Y.Y. (born April 2016), alleging that the minors came within the provisions of section 300, subdivision (b) due to ongoing domestic violence between mother and T.Y., Sr. (father).  The petitions additionally alleged jurisdiction under subdivision (g) based on mother's inability to provide support for the minors due to her hospitalization for a serious medical condition and consumption of high doses of pain medication.

In March 2021, the Bureau had received a referral alleging general neglect of seven-year-old T.Y. and four-year-old Y.Y., along with their older half-sibling, L.B.  According to the reporting party, mother's mental state appeared to be impaired due to substance use or a mental health condition. The Bureau located and interviewed mother at John Muir Medical Center on June 8, 2021.  She disclosed that, at the beginning of June, father put her in a choke hold and began choking her and hitting her in the face.  The social worker observed a broken blood vessel in mother's left eye and was informed by staff that mother had bruising on her leg and a large bruise on her upper left arm.  Mother stated T.Y. and Y.Y. did not witness the incident but she "strongly believe[d]" they heard it.  Father was arrested and mother took T.Y. and Y.Y. to a domestic violence shelter.  Mother further explained that her older sons—L.B. and his adult brother, C.B.—had previously "seen and heard [her] being choked out and abused by [father]."  She sent them to live with their father, S.B., three months before this latest domestic violence incident.

2

According to mother, she had been together with father on and off for eight years and had moved back to California with him in October 2020, after which he had been "treating her mean" and they had "a lot of domestic disputes." Mother felt that father wanted to kill her. Despite his continuing to beat her, mother repeatedly went back to father because she was homeless at one point in her life, and she had no one else to help her. When interviewed, Y.Y. was aware that father "pushed mommy" and "hurt her" but stated she was not afraid of either parent. T.Y. reported that he had never seen his parents fight but he hears father hit his mother. He was afraid to go home with father.

Mother, T.Y., and Y.Y. were living in the shelter when mother, who has leukemia, discovered she left her pain medications in the family home. She was afraid to retrieve them, and, eventually, her pain became so severe that she had to be transported by ambulance to the hospital. Mother reported she takes Dilaudid, OxyContin, and Xanax for pain, and sometimes takes more than the prescribed dosage to help her sleep. Because she was in constant pain, it was difficult for her to keep the family home clean. Mother disclosed that T.Y. had a gun in the home, but she did not want "to press the issues and get him into any trouble." She did not plan to go back to the residence upon her discharge from the hospital because she needed "to protect [herself] and [her] children."

T.Y. and Y.Y. were taken into protective custody because mother was unable to care for them, father had a protective order against him, and no other relatives could be identified who were willing to take the children. The two minors were placed together in the same foster home. A records review showed mother had a history of arrests between 1999 and 2018, including

four misdemeanor convictions in 1999–2000—one for obstructing a police officer and three for various assault crimes.

The social worker contacted C.J.—mother's cousin-in-law and a potential placement for the younger children. C.J. reported that mother struggled with methamphetamine use. She confirmed mother's leukemia and stated father had a babysitter for the children while he worked. In her opinion, T.Y. and mother were " 'just not good together.' " C.J. was concerned that if the younger children were released to T.Y., mother would attempt suicide. She had done so several times over the years. T.Y. had admitted to C.J. that he had been "beating [mother] up." Mother had told C.J. on various occasions that T.Y. had tapped her phone, taken money out of her account, and stolen things from her. Given the "toxicity" of mother and T.Y.'s relationship, C.J. had instructed 18-year-old C.B. to call their father to come get him and L.B. The two had been with S.B. for about three months.

T.Y. told the social worker that there was no restraining order against him because mother had three days to extend the temporary order, and she failed to do so. With respect to family history, he stated that when mother moved to California with her children in 2018, he stayed behind in Texas. He described mother as paranoid and stated she had struggled with drugs and alcohol over the last several years. T.Y. also acknowledged that mother had been suicidal on several occasions. Given the "tremendous difficulty" mother was facing, T.Y. had traveled to California at least three times to check on the family. Mother and T.Y. rekindled their romantic relationship at one point, and mother and the children returned to Texas. While there, mother assaulted T.Y. with a knife, resulting in a cut on his hand and an open child welfare case in Texas. T.Y. admitted to engaging in four or five domestic violence incidents with mother where he had called the police. With respect

4

to the June 2021 domestic violence incident, T.Y. claimed he only pushed mother off of him to protect himself, did not recall hitting mother, and was unaware of the reason for his arrest. He stated mother had assaulted a woman that same night and might have received bruising around her eye from that altercation.

T.Y. was self-employed in construction/tile work. About three months before child welfare's involvement, father quit his other job in order to find an appropriate babysitter because mother "was leaving for weeks at a time." During this timeframe, mother was threatening suicide and her substance abuse was out of control, so T.Y. sent C.B. and L.B. to live with their father. According to T.Y., mother had been offered space in a stem cell program to treat her leukemia but was hesitant because the process might compromise her immune system and she was abusing drugs and alcohol.

T.Y. confirmed he had a legal firearm he kept in a lock box which required fingerprints to open. He claimed not to keep it in the house, noting that mother had searched for the gun previously. T.Y. stated he was "no longer sure of [mother's] mental capacity. He reported he primarily cared for the children, explaining that " 'although [mother] is a beautiful person, she is not a good parent.' " T.Y. had a history of arrests from 2007 through 2021, but no convictions.

S.B. confirmed that L.B. was in his care. He stated there was a formal custody arrangement through family court which allowed him to have L.B. for the summer and mother to have custody during the school year. However, father had removed L.B. from mother approximately one month early because "her household was unmanageable."

Due to mother and father's history of domestic violence, mother's possible substance abuse and potential unaddressed mental health issues, as

5

well as questions regarding medical management of mother's serious health condition, the Bureau recommended that T.Y. and Y.Y. be detained from both parents and placed in out-of-home care. T.Y. and Y.Y. were formally detained at the detention hearing on June 14, 2021. Both parents were offered supervised visitation with the children a minimum of twice per week, as well as supervised phone contact. The court ordered that the parents not visit together. Following a number of continuances, mother's counsel was relieved and new counsel was appointed after an October 2021 *Marsden*[2] hearing. At that time, mother was incarcerated but she was released by late November.

In advance of the contested jurisdictional and dispositional hearing, the Bureau filed a report and a supplemental memorandum. The report stated that mother and the children lived with the maternal grandmother for about a year. However, the level of domestic violence between mother and father was too much for the maternal grandmother, and she asked them to leave. Despite all of the information received, as of the time the social worker prepared the report, mother was denying domestic violence in her relationship with T.Y., claiming she had no mental health issues, and denying use of any non-prescribed drugs. She variously reported that her leukemia was both "under control" and "end stage." She declined to participate in a psychosocial interview or disclose her current whereabouts.

T.Y. was reported to have certain behavioral issues in his foster placement but no behavioral issues at school. The social worker opined that, "[a]lthough outwardly calm and polite, he presents as a child filled with hidden anger," which can manifest itself, for example, in "physical rigidity, fidgeting, emotional withdrawal and perfunctory verbal responses." T.Y. had disturbed sleep at night, and the caregivers were working with him to

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

establish a bedtime routine, as he initially observed no set bedtime and would stay up all night. T.Y. also exhibited inappropriate sexualized behaviors towards his sister to the extent that the two siblings had to be separated. In his new placement, T.Y. continued to engage in sexualized behaviors, although they were no longer directed at a specific individual.

Y.Y. was described as a happy, social girl. She had not seen a doctor since 2018. She required extensive dental work, treatment for a speech delay, and assessment regarding whether she was on the autism spectrum. In the foster home, Y.Y. experienced night terrors once or twice a week, where she woke up screaming.

As of the time of the report, mother had participated in seven in-person visits and had failed or was a no show for 12 visits. Father had four in-person and four cancelled visits. When visits did not occur, T.Y. became angry and Y.Y. would cry. When contact did occur, both parents failed to abide by visitation rules, making promises of gifts or that the children would be home soon. Father was observed to make critical, demeaning remarks to T.Y., while favoring Y.Y. Mother also made dismissive and demeaning comments to T.Y. On one visit, she told the children that she and father were back together. After visits, Y.Y. would soil herself, spending long periods of time in the bathroom.[3] A fixed schedule of evening phone calls between 7:00 and 8:00 p.m. was established to stem repeated phone calls and texts after the children were in bed. Mother had not called for over a month at the time the report was submitted.

---

[3] By the time of the October 25 supplemental memorandum, Y.Y. had developed chronic encopresis and enuresis throughout each day, requiring an intensive level of supervision and care, including continual cleaning of the child and her clothing.

In concluding that the children would be at high risk in the home of either parent, the Bureau stressed the following: both parents had declined to disclose their living circumstances; the parents had engaged in several domestic violence incidents, including yelling, throwing objects, grabbing, physical striking, and choking; mother had a serious medical illness that required pain management; mother had potential mental health and substance abuse issues that needed to be addressed; and neither parent had acknowledged any level of risk to their children. The Bureau opined that both children had significant physical, mental health, and educational needs that could only be addressed in a stable, nurturing home. It recommended reunification services for both parents.

The contested jurisdictional and dispositional hearing was finally held on January 6, 2022. At the request of the Bureau, the court amended the subdivision (b) allegations with respect to each child to provide: (1) "Mother is unable to protect the child from ongoing domestic violence with [father], in that the parents have engaged in at least five incidents of domestic violence, at least one of which occurred in the child's presence;" and (2) "Father is unable to protect the child from ongoing domestic violence with [mother], in that the parents have engaged in at least five incidents of domestic violence, at least one of which occurred in the child's presence."[4] Counsel for the Bureau then submitted the jurisdictional matter on the evidence contained in the June 2021 detention/jurisdiction report. Father's attorney indicated that his client had prepared a waiver of rights form with respect to the amended language and was not contesting jurisdiction.

Mother's attorney called the social worker, who testified that, after father was arrested for the June 2021 domestic violence incident, mother was

[4] The remainder of the allegations in the petitions were dismissed.

8

referred to a shelter by the police and went there with the children. The social worker also confirmed that T.Y. had stated he was never present during a physical altercation between the parents. After argument with respect to jurisdiction, the juvenile court sustained the amended petitions with respect to both T.Y. and Y.Y.

Turning next to dispositional issues, the Bureau submitted the matter based on the evidence in the detention/ jurisdiction report, the jurisdiction/disposition report, and the supplemental memorandum. Mother called the social worker, who testified she was not aware of any instances of mother abusing her prescribed medication since June 2021. The social worker also testified that mother had been arrested in September 2021 but she was not aware of any resolution in the case. On cross-examination, the social worker recounted that, according to the related police report, mother's recent arrest involved an allegation that she had attacked a man sitting on a couch without warning with a baseball bat. Mother was reportedly hearing voices at the time.

Mother's attorney argued that the evidence regarding her alleged behavior was based largely on speculation and the reports of father and S.B., both of whom had ulterior motives. She also stressed that the allegations were based on stale information, as it had been seven months since detention. Father's counsel objected to the family reunification recommendation, seeking return of the children. The juvenile court, however, indicated it was "absolutely going to refer them for family reunification." Even putting aside the evidence of mother's recent assault arrest, it found the evidence sufficient to support the recommendations for mental health and substance abuse assessments for mother and noted, with respect to domestic violence, "undisputed evidence of the ongoing violence between these two parents."

9

The court found particularly credible the statements from the maternal grandmother. It therefore declared T.Y. and Y.Y. to be juvenile court dependents, removed them from the physical custody of both mother and father, and ordered reunification services.

This timely appeal followed.

## II. DISCUSSION

### A. *Jurisdictional Findings*

#### i. *Legal Framework*

Dependency jurisdiction may be asserted under subdivision (b) of section 300 if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of his or her parent . . . to adequately supervise or protect the child," or the "willful or negligent failure" of the parent to protect the child from the conduct of a custodian with whom the child has been left. (§ 300, subd. (b)(1)(A) & (B).) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; see *In re T.V.* (2013) 217 Cal.App.4th 126, 133 (*T.V.*) ["[t]he focus of section 300 is on averting harm to the child"].)

It is well settled that physical violence between a child's parents may support the exercise of jurisdiction under subdivision (b)(1) of section 300 where there is evidence that the domestic violence has placed the child *at risk* of physical harm and the violence is ongoing or likely to recur. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1453–1454; *In re R.C.* (2012) 210 Cal.App.4th 930, 941–942; *In re Daisy H.* (2011) 192 Cal.App.4th 713, disapproved on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 278 (*D.P.*).) "It is clear . . . that domestic violence in the same household where children are living *is*

neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194.)], disapproved on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 628–629 (*R.T.*).) The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing " 'subject the minor to the defined risk of harm.' " (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

"The court may consider past events in deciding whether a child currently needs the court's protection." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383; see *T.V.*, at p. 133.) Indeed, in a domestic violence situation, past violence is highly probative of the risk that violence may recur. (See *In re E.B.* (2010) 184 Cal.App.4th 568, 576 [" 'Past violent behavior in a relationship is "the best predictor of future violence." Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of these relationships.' "], disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 (*O.B.*); *In re John M.* (2013) 217 Cal.App.4th 410, 419 [concluding even a single incident of domestic violence may be sufficient to support a jurisdictional finding under section 300, subdivision (b)], disapproved on another ground in *R.T.*, *supra*, 3 Cal.5th at pp. 628–629.) To establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146 (*D.L.*).)

A jurisdictional finding that the minor is a person described in section 300 must be made by at least a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) "We review the jurisdictional findings for substantial evidence. [Citation.] We consider the

entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding.  [Citation.]  We do not consider the credibility of witnesses or reweigh the evidence."  (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137–138.)  "The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order."  (*Id.* at p. 138.)

> *ii.*	*There is a Justiciable Controversy*

Preliminarily, we must determine whether mother's jurisdictional challenge is justiciable.  As the Supreme Court recently acknowledged, "the principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation] means that '[a]s long as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate' [citation].  Thus, where jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot."  (*D.P.*, *supra*, 14 Cal.5th at p. 283.)

Here, because the court's unchallenged findings involving father create an independent basis for jurisdiction, under certain circumstances we would not be required to address the adequacy of mother's jurisdictional findings on appeal.  However, the *D.P.* Court also clarified that "where a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot.  (*D.P.*, *supra*, 15 Cal.5th at p. 283.)  Since, in this case, mother is also challenging the juvenile court's dispositional order, we proceed to the merits of her jurisdictional challenge.

> *iii.*	*Substantial Evidence Supports the Jurisdictional Findings*

Mother asserts that the section 300, subdivision (b) finding for each child which involved her conduct—"Mother is unable to protect the child from ongoing domestic violence with [father], in that the parents have engaged in

12

at least five incidents of domestic violence, at least one of which occurred in the child's presence"—was not sufficiently supported by the evidence. Specifically, she argues that there was no evidence of a current risk of physical harm to the children at the time of the jurisdictional hearing because: the June 2021 domestic violence incident took place seven months prior to jurisdiction and occurred outside of the presence of the children; there is no indication when the other incidents of domestic violence alleged in the petitions occurred or whether the children were exposed to them; and there was no evidence that any domestic violence occurred since June 2021 or that it would recur in the future. Mother additionally points to evidence that she was aware of the problem and had already taken steps to address it by sending her older sons to live with their father and removing herself and the younger children to a domestic violence shelter. We are not persuaded.

The relevant inquiry under section 300, subdivision (b)(1), as stated above, is whether circumstances at the time of the jurisdictional hearing " 'subject the minor to the defined risk of harm.' " (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.) Here, we have no difficulty concluding that T.Y. and Y.Y. were subject to such a risk. There was a significant history of past domestic violence in this case confirmed by statements from mother, father, and C.J.[5] The evidence discloses that, on at least five occasions, the abuse was significant enough that father called the police; one incident involved mother wielding a knife; and the police were called after father hit mother in the face and tried to choke her. Further, there was a gun in father's possession, which mother had attempted to locate in the past, and mother

---

[5] Because the attorney for the Bureau submitted the jurisdictional matter based solely on the evidence contained in the June 2021 detention/jurisdiction report, we do not, at this juncture, discuss evidence contained in later materials.

stated she always went back to father because she had been homeless before and she had no one else to help her.

There was also significant evidence of mother's own assaultive behaviors—in her criminal history, her assault on father with a knife in Texas, and her alleged physical altercation with a woman on the same day as the June 2021 domestic violence incident. Thus, the ongoing domestic violence risk to these children did not necessarily depend on mother reuniting with father, especially since they would be coparenting two young children. The substantial evidence in the record regarding mother's unaddressed substance abuse and mental health issues further exacerbated this risk.[6] Finally, although mother may have taken some initial actions to protect her children in the heat of past domestic violence situations, she failed to maintain the temporary restraining order against father and provided no evidence of continued engagement in any services addressed at ameliorating the Bureau's concerns. Substantial evidence thus supported the jurisdictional findings made with respect to mother.

---

[6] Although it is true that T.Y. told a social worker he had never seen his parents fight and it is unclear whether Y.Y.'s statement that father pushed and hurt mother was based on her own observations, we conclude—given the pervasive nature of the domestic violence in this family and mother's admission that her older children had witnessed it—that it is a reasonable inference from the evidence that T.Y. and Y.Y. had witnessed at least one act of domestic abuse in the past as alleged in the petitions. There is certainly abundant evidence that the children would have been at substantial risk of future physical harm absent the Bureau's intervention.

## B. *Dispositional Removal Order*

### i. *Legal Framework*

After finding that a child is a person described in section 300, the juvenile court, "shall hear evidence on the question of the proper disposition to be made of the child." (§ 358, subd. (a).) In doing so, the court considers the social worker's report and any relevant or material evidence offered. (*Id.*, subd. (b)(1).) The court generally chooses between allowing the child to remain in the home of a parent with protective services in place and removing the child from the home while the parent engages in services to facilitate reunification. (*In re E.E.* (2020) 49 Cal.App.5th 195, 205.)

In order to remove a child from parental custody at a dispositional hearing, the juvenile court must make one of a number of statutorily enumerated findings by clear and convincing evidence. (§ 361, subd. (c).) Here, the juvenile court found with respect to each of the children that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home," and that there were "no reasonable means" by which the minor could be protected short of removal. (*Id.*, subd. (c)(1).) A removal order on these grounds " 'is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, disapproved on another ground in *O.B.*, *supra*, 9 Cal.5th at p. 1010, fn. 7.)

15

"[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, 9 Cal.5th at pp. 995–996; see also *In re V.L.* (2020) 54 Cal.App.5th 147, 154–155.)

### ii. *Substantial Evidence Supports the Removal Order*

Mother next argues there was not clear and convincing evidence of a substantial danger to the children necessitating their removal from her physical custody at the dispositional hearing. Specifically, she claims that there would be no danger to the children being in her care if T.Y. was not present. She also contends that any danger to the children based on her possible mental health or substance abuse issues was speculative. And she notes that she demonstrated that she was able to secure housing for the children when she took them to the domestic violence shelter. Again, we disagree.

It is true, as mother argues, that jurisdictional findings (made by a preponderance of the evidence) are not in and of themselves sufficient to justify a dispositional removal order. Here, however, there is a plethora of evidence supporting the juvenile court's finding that there was "a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of these children if they were returned home. (§ 361, subd. (c)(1).)

16

As discussed at length above, substantial evidence supported the ongoing physical risk from domestic violence for these children, even if T.Y. and mother were not living together. Indeed, mother's own erratic and violent behaviors presented a substantial physical risk in their own right. And mother's assertions to the contrary notwithstanding, substantial evidence also supported the conclusion that unresolved substance abuse and mental health issues placed these children at risk. Moreover, mother ignores the significant risk to the children's emotional well-being evident on this record. (See *In re H.E.* (2008) 169 Cal.App.4th 710, 721 [removal order may be based on risk of emotional harm].) The social worker reports in this case chronicle substantial mental health and educational needs, in addition to physical deficits, facing these minors. And the Bureau opined that the children required a stable, nurturing environment to address all of these issues. Since the record contains ample evidence of a continuing risk of both physical and emotional harm to these young minors, substantial evidence exists to support the juvenile court's removal order.

## C. ICWA Issues

Mother finally contends that there was insufficient inquiry in these proceedings regarding the possibility that T.Y. and Y.Y. may be Indian children for purposes of ICWA. She asserts that the juvenile court's ICWA finding must therefore be reversed as not supported by substantial evidence. The Bureau concedes error on this point. We accept its concession but conclude that reversal is not required on these facts.

At the beginning of this case in June 2021, both parents denied any Indian ancestry in response to questioning by the social worker. Mother and father subsequently refused to meet with the social worker of fill out the standard ICWA forms. At the detention hearing on June 14, 2021, the

17

juvenile court completed verbal ICWA inquiries with each parent. Given the parents' negative responses to all questions posed, the court concluded that there was no reason to believe or reason to know that T.Y. and Y.Y. were Indian children. On December 13, 2021, shortly before the jurisdictional and dispositional hearing, mother filed a parental notification of Indian status stating that she was or might be a member of, or eligible for membership in, a federally recognized Indian tribe. The form contained no other information. Although the Bureau interviewed several relatives, including, as discussed above, the maternal grandmother, there is no evidence in the record that any extended family members were queried regarding the children's possible Indian ancestry.

Under ICWA, when a child is placed into temporary custody of a social services agency, the agency "has a duty to inquire whether that child is an Indian child. Such inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, *extended family members*, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b), italics added; see also Cal. Rules of Court, rule 5.481(a).) Here, the Bureau failed to satisfy its initial inquiry duty because it provided no evidence it had questioned the maternal grandmother, or other known extended family, regarding the children's possible Indian ancestry.

While we generally review a juvenile court's ICWA findings for substantial evidence, appellate review in this context tends to focus on whether any admitted error was harmless. (*In re S.H.* (2022) 82 Cal.App.5th 166, 175 (*S.H.*).) However, noting that the duty to inquire under ICWA "is a *continuing* one" and that "the juvenile court, even after it concludes that

18

ICWA does not apply, retains the power (and duty) to *reverse* that determination 'if it subsequently receives information providing reason to believe that the child is an Indian child,' " we recently jettisoned this harmless-error construct under circumstances similar to those presented here. (*Id.* at p. 176.) Rather than "focusing on whether the same ICWA finding would have been made absent error," we determined we should "focus instead on whether the social service agency acknowledges error." (*Ibid.*) Under such circumstances, we would "have reason to believe that its duty of inquiry will be satisfied." (*Ibid.*) In other words, the fact that the child welfare agency had acknowledged error indicated that it understood its duty and realized that it "must satisfy this duty, if it ha[d] not done so already, and report its findings to the juvenile court." (*Ibid.*)

We thus hold, as we held in *S.H.*, "that disturbing an early order in a dependency proceeding is not required where, as here, the court, counsel, and the [Bureau] are aware of incomplete ICWA inquiry. The [Bureau] must comply with its broad duty to comp[l]ete all appropriate inquiries and apprise the court, and the court has a continuing duty to ensure that the [Bureau] provides the missing information. So long as proceedings are ongoing and all parties recognize the *continuing* duty of ICWA inquiry, both the [Bureau] and the juvenile court have an adequate opportunity to fulfill those statutory duties." (*S.H.*, *supra*, 82 Cal.App.5th at p. 179.)

## III. DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.

SWOPE, J.[*]

WE CONCUR:

HUMES, P. J.

MARGULIES, J.

AA154644N

---

[*] Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.